J-S07005-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRANDON JUNE WILSON | : | |
| | : | |
| Appellant | : | No. 1470 EDA 2019 |

Appeal from the Order Entered April 16, 2019
In the Court of Common Pleas of Monroe County Criminal Division at
No(s): CP-45-CR-0000597-2014

BEFORE:   NICHOLS, J., KING, J., and STRASSBURGER, J.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED MAY 11, 2020**

Appellant Brandon June Wilson appeals from the judgment of sentence imposed following a retrial for third-degree murder, conspiracy, and three counts of recklessly endangering another person (REAP).[1]   Appellant challenges the sufficiency of the evidence for both his REAP and third-degree murder convictions.   He also raises errors in the trial court's evidentiary rulings, jury instructions, and his sentence.   We affirm.

The trial court summarized the facts of this matter as follows:

On January 13, 2014, Kaylynn Bunnell and her boyfriend, Matt Flores, sought to buy drugs from Brandon Kravchenko.   A deal was set up and Kravchenko put Flores in contact with a man named "Jordan" in the parking lot of the Big Star to buy Percocet

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(c), 903, and 2705, respectively.

30s.[2] During this deal, "Jordan" took Flores and Bunnell's money and gave them fake drugs in return. Bunnell then called her best friend, Jacqueline Harrigan, to complain about the bad drug deal. Bruce Murray, Harrigan's boyfriend, answered the phone and listened to Bunnell's complaints. Murray then asked if Bunnell wanted to do anything about the drug deal and Bunnell said she did.

Murray, a member of the Black P-Stone street gang, contacted Sirvonn Taylor, [the "amir"[3]] in the gang, for direction on how to handle the situation. Taylor gave the go-ahead for a confrontation, instructing Murray to take Dyqunn Mitchell, another Black P-Stone, with him[.] Murray, Harrigan, and Bunnell drove to pick up Mitchell. [Appellant], also a Black P-Stone, was with Mitchell and overheard the conversation. [Appellant] was subsequently asked if he also wanted to go. [Appellant] agreed and a loaded gun was placed in the trunk of the car.

Upon arrival at the Kra[]vchenko residence, Bunnell and Harrigan knocked on the door and spoke to a man inside. The man was later identified as "Jordan," the man who sold Bunnell the fake drugs. At that point, Murray called Taylor again. As a result of the conversation with Taylor, the men retrieved the gun from the trunk and the entire group got back in the car. [Appellant] instructed Bunnell to "creep" by the house and while she did that, [Appellant] and Mitchell shot at the Kravchenko residence. One of the bullets entered the bedroom window and hit Darcy Kravchenko [(the decedent)] in the head, causing his death shortly thereafter.

Trial Ct. Op., 6/27/19, at 1-2.

---

[2] Appellant's co-defendant, Taylor, testified that "they call them Perc 30s" because each pill is 30 milligrams. **See** N.T. Trial, 1/23/19 at 52.

[3] Trooper Craig VanLouvender testified that Taylor "had a bunch of different names that people would refer to him as," including "Amir." **See** N.T. Trial 1/22/19 at 219, 234. Trooper William Patton also testified that Taylor had several names and that he was "the unquestioned leader" of the Black P-Stones gang. **See** N.T. Trial, 1/23/19, at 122.

On March 31, 2014, the Commonwealth filed a criminal information charging Appellant with murder, conspiracy, tampering with evidence, and three counts of REAP.[4]  **See** Criminal Information, 3/31/14.

On January 18, 2019, Appellant filed a motion *in limine* seeking to preclude Trooper Patton from "giving prior bad act testimony about [Appellant's] gang affiliation, his uncharged criminal acts, and gang members and gang activity unrelated to the crimes at issue."  Motion in Limine, 1/18/19, at 3.  In support, Appellant argued that that Trooper Patton's expert testimony was "irrelevant and unduly prejudicial given the limited nexus between the [topics involving the gang and Appellant's] alleged involvement in a conspiracy to retaliate for a botched drug deal between [four] people with no connection to the Black P-Stones."  **Id.** at 4.  Appellant also sought to preclude the Commonwealth from introducing as evidence the sawed-off shotgun that was recovered from Appellant's co-defendant, Mitchell, at the time of his arrest.  **Id.** at 5.  The trial court denied Appellant's motion on January 22, 2019.  **See** N.T. Trial, 1/22/19, at 9.

---

[4] Although the criminal information did not identify the complainant for each count of REAP, the Commonwealth presented evidence that Kimberly Kravechenko, Terrance Tyson, Darien Vanwert, Alyssa Kravechenko, and/or Brandon Kravechenko were present in the trailer at the time of the shooting. **See** N.T. Trial, 1/25/19, at 2.

On January 25, 2019, following a three-day jury trial, Appellant was convicted of third-degree murder, conspiracy, and three counts of REAP.[5],[6] On April 28, 2019, the trial court sentenced Appellant to concurrent terms of sixteen to forty years' incarceration for both third-degree murder and conspiracy, followed by consecutive terms of seven to eighteen months' incarceration for each count of REAP. **See** N.T. Sentencing Hr'g, 4/16/19, at 23-26. The trial court also awarded Appellant credit for time served. **Id.** at 26.

Appellant did not file a post-sentence motion. On May 14, 2019, Appellant filed a timely notice of appeal. He subsequently filed a timely court-ordered Pa.R.A.P. 1925(b) statement. The trial court issued a Rule 1925(a) opinion asserting that Appellant's claims were meritless.

On appeal, Appellant raises the following issues, which we have reordered as follows:

1. Should [Appellant's] convictions be vacated for evidentiary insufficiency where the Commonwealth (a) relied exclusively on "corrupt and polluted sources" to prove its homicide case and (b) failed to introduce evidence that anyone other than

---

[5] This was Appellant's second jury trial. Initially, a jury convicted Appellant of the instant charges on June 15, 2016. On appeal, this Court reversed Appellant's convictions and remanded the matter for a new trial. **See Commonwealth v. Wilson**, 3217 EDA 2016 (Pa. Super. filed January 19, 2018) (unpublished mem.) (concluding that the trial court committed reversible error by allowing the Commonwealth to introduce a statement that Appellant made during plea negotiations without a valid waiver of his rights under Pa.R.E. 410).

[6] Appellant was tried separate from his co-defendants, who pled guilty prior to trial.

[the decedent] was in the trailer at the time of the shooting with respect to REAP?

2. Is [Appellant] entitled to a new trial in light of the trial court's erroneous evidentiary rulings, including its decision to allow the Commonwealth to present irrelevant and prejudicial expert testimony about the history, organization, structure, and criminal activities of the Black P-Stone gang despite the limited nexus between the underlying drug deal and the gang?

3. Did the trial court err in refusing Appellant's requested jury instructions on (a) involuntary manslaughter (b) the "missing evidence" jury instruction?

4. Did the trial court abuse its discretion by refusing to grant [Appellant] credit for his time served in prison and in re-sentencing him to an aggregate state prison sentence of 17.75 years to 44.5 years in state prison?

Appellant's Brief at 7-8.

In his first claim, Appellant challenges the sufficiency of the evidence supporting his conviction for third-degree murder. *Id.* at 33. Appellant argues that the Commonwealth "relied almost exclusively on corrupt and polluted sources—namely, his co-conspirators" to establish the elements of third-degree murder. *Id.* Although Appellant does not specify which element or elements the Commonwealth failed to prove, he argues that the evidence was insufficient due to "the inherently flawed and unreliable character of [the Commonwealth's] witnesses." *Id.*

The Commonwealth responds that "[b]ecause the jury is free to believe or disbelieve the evidence [presented] to them, Appellant's claim relating to the sufficiency of the evidence is without merit." Commonwealth's Brief at 33. Similarly, the trial court, after reviewing the trial record, concluded there

was sufficient evidence for the jury to conclude that Appellant committed the killing with malice aforethought. Trial Ct. Op. at 18.

In reviewing a challenge to the sufficiency of the evidence, our standard of review is as follows:

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

*Commonwealth v. Palmer*, 192 A.3d 85, 89 (Pa. Super. 2018) (citation omitted), *appeal denied*, 204 A.3d 924 (Pa. 2019).

Here, to the extent Appellant challenges his third-degree murder conviction based on the sufficiency of the evidence generally, his claim is waived. *See Commonwealth v. Garland*, 63 A.3d 339, 344 (Pa. Super. 2013) (reiterating that an appellant's Rule 1925(b) statement must state with specificity the element or elements upon which the appellant alleges that the evidence was insufficient); *see also* Appellant's Rule 1925(b) Statement, 5/14/19, at 1 (arguing that the trial court "erred in concluding that the evidence was sufficient to support Appellant's conviction" for third-degree

murder); **see also Commonwealth v. Cannon**, 954 A.2d 1222, 1228 (Pa. Super. 2008) (reiterating that "when the trial court has to guess what issues an appellant is appealing, that is not enough for meaningful review" and stating that a vague Rule 1925(b) statement may result in waiver, even if the trial court correctly guesses the issues an appellant seeks to raise on appeal (citations and quotation marks omitted)).  The trial court "guessed" at the issue and stated that there was sufficient evidence that Appellant acted with malice.  On appeal, Appellant has altered his sufficiency claim to focus on the credibility and reliability of allegedly "corrupt" witnesses.  Under these circumstances, we are constrained to conclude that because Appellant did not raise this issue in his Rule 1925(b) statement, it is waived.  **See** Pa.R.A.P. 1925(b)(4)(vii); **Cannon**, 954 A.2d at 1228.

In any event, Appellant's present appellate challenge to the credibility or reliability of the Commonwealth's witnesses goes to the weight, not the sufficiency, of the evidence.  **See Commonwealth v. Samuel**, 102 A.3d 1001, 1005 (Pa. Super. 2014) (stating that a claim that the Commonwealth's evidence lacked credibility goes to the weight of the evidence).  Because Appellant failed to preserve a weight claim, it is waived.  **See Commonwealth v. Widmer**, 744 A.2d 745, 753 (Pa. 2000) (stating that a weight claim must be presented to the trial court, because appellate courts review a trial court's "exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence" (citation omitted)).  Therefore, Appellant is not entitled to relief on this issue.

Appellant also challenges the sufficiency of the evidence supporting his REAP convictions. Appellant's Brief at 31. Specifically, Appellant contends that the Commonwealth "failed to introduce any direct evidence that [anyone] other than [the decedent] was in the trailer at the time of the shooting." *Id.* at 31-32. Appellant asserts that, "[i]nstead, the Commonwealth relied on the 911 call from [Kimberly] Kravchenko, wherein she can be heard to say, 'I just heard gunshots in my house.'" *Id.* at 32. Appellant maintains that "[t]he 911 call is inadmissible hearsay and therefore incompetent to establish beyond a reasonable doubt the presence of any person at the scene." *Id.*

The Commonwealth responds that "[d]uring the trial, [Appellant] stipulated to the admission of the 911 call" in which "[Kimberly] Kravchenko can be heard speaking to other individuals in the residence to confirm that no one was injured when they were in the house during the drive-by shooting." Commonwealth's Brief at 32. Further, the Commonwealth asserts that another witness "testified that she saw at least two individuals in the residence . . . just before the drive-by shooting occurred." *Id.* Therefore, the Commonwealth contends that the jury heard sufficient evidence to support Appellant's convictions for REAP. *Id.* at 32-33.

In its Rule 1925(a) opinion, the trial court found that the Commonwealth presented sufficient evidence to support Appellant's REAP convictions.[7] *See* Trial Ct. Op. at 16-17.

However, on appeal, Appellant's sufficiency claim is based on his own conclusion that the Commonwealth relied on inadmissible evidence. However, we do not review a sufficiency claim on a diminished record. See *Commonwealth v. Gray*, 867 A.2d 560, 567 (Pa. Super. 2005) (stating that "[i]n evaluating the sufficiency of the evidence, we do not review a diminished record. Rather, the law is clear that we are required to consider all the evidence that was actually received, without consideration as to the admissibility of that evidence or whether the trial court's evidentiary rulings are correct" (citation and quotation marks omitted)). The trial court properly concluded that the Commonwealth presented sufficient evidence to support Appellant's convictions for REAP.[8] *See* Trial Ct. Op. at 16-17. Therefore, Appellant's claim fails. *See id; see also Palmer*, 192 A.3d at 89.

---

[7] Section 2705 of the Crimes Code provides that a defendant is guilty of REAP "if he recklessly engages in conduct which places or may place another person in danger or death or serious bodily injury." 18 Pa.C.S. § 2705.

[8] We agree with the trial court's thorough analysis and finding that there was sufficient evidence to support Appellant's REAP convictions. *See* Trial Ct. Op. at 16-17. Therefore, even if Appellant properly challenged his conviction based on the complete record, we would find his claim meritless.

In his next issue, Appellant challenges several of the trial court's evidentiary rulings.[9] Appellant's Brief at 20.

The admission of evidence is committed to the sound discretion of the trial court and our review is for an abuse of discretion. *Commonwealth v. Kane*, 188 A.3d 1217, 1229 (Pa. Super. 2018). As our Supreme Court has explained,

> [a]n appellate court will not find an abuse of discretion "based on a mere error of judgment, but rather . . . where the [trial] court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." Importantly, an appellate court should not find that a trial court abused its discretion merely because the appellate court disagrees with the trial court's conclusion. Indeed, "when reviewing the trial court's exercise of discretion, it is improper for an appellate court to 'step[ ] into the shoes' of the trial judge and review the evidence *de novo*."

*Commonwealth v. Gill*, 206 A.3d 459, 466-67 (Pa. 2019) (citations omitted).

Generally, "[a]ll relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. However, the trial court

---

[9] To the extent Appellant challenges expert testimony by Trooper VanLouvender and Trooper Sebastianelli, *see* Appellant's Brief at 26-28, Appellant has waived this issue by failing to raise it in his Rule 1925(b) statement. *See* Pa.R.A.P. 1925(b)(4). Therefore, we decline to address this issue on appeal.

"may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

### Trooper Patton's Testimony

Appellant argues that the trial court erred by allowing Trooper Patton to provide "expert testimony about the history, structure, organization, and criminal activities of the Black P-Stone gang of which [Appellant] was admittedly a member." Appellant's Brief at 20. Appellant asserts that "[t]here is no allegation that [the decedent's] death had anything to do with the Black P-Stones' involvement with prostitution, human and drug trafficking, or the myriad of other lurid topics discussed by Trooper Patton." *Id.* at 25. He asserts that, "for this reason, whatever probative value Trooper Patton's testimony may have had as background information was vastly outweighed by the danger that the jury would convict [Appellant] based solely on his affiliation with Taylor and the Black P-Stones." *Id.*

The Commonwealth responds that "Trooper Patton's testimony was two-fold. First[,] it was permissible as expert testimony to provide information to the jury that would be beyond the common lay person's knowledge." Commonwealth's Brief at 11. Specifically, Trooper Patton provided "necessary clarity as to the importance of the gang before, during, and after the drive-by shooting." *Id.* at 12-13. Second, the Commonwealth asserts that Trooper Patton's testimony was "permissible [Rule] 404(b) evidence, offered for the

purpose of showing Appellant's motive, intent, and plan for committing the drive-by shooting that caused the death of [the decedent]." *Id.* at 11.

The trial court addressed Trooper Patton's testimony as follows:

According to the evidence presented at trial, Appellant's gang affiliation prompted his entire involvement in the criminal episode that led to the death of [the decedent]. Furthermore, the Black P-Stone hierarchy and protocol dictated the level of Appellant's involvement in this incident.

Murray, a low-level Black P-Stone member, contacted Mitchell, another low-level Black P-Stone member, to assist him in handling the situation after first consulting with Taylor, a Black P-Stone member with a higher rank than Murray, Mitchell, or Appellant. Upon arrival at the Kravchenko residence and after the group assessed the situation, the group again contacted Taylor seeking guidance and asking permission for their subsequent actions. Evidence of Appellant's gang involvement makes the fact of his participation in the drive-by more probable than without such evidence. Furthermore, after the criminal episode, Taylor saw Jacquie Harrigan while she was having a cigarette break during her police interview. He believed she looked nervous and was "snitching" about the shooting so he started calling everyone involved, in particular, Appellant and Mitchell, to make arrangements for Appellant to get out of the area and for Mitchell to get everything associated with the crime over to the gang's trap house to get rid of it. Mitchell was arrested after leaving his grandmother's house after he returned from dropping off the gun used in this crime at the trap house. When Mitchell was apprehended, he dropped a blanket which contained a shotgun.

Appellant would have had little, if any, reason to accompany this group to the Kravchenko residence and participate if not for his affiliation with the Black P-Stones, the hierarchy and protocol within the gang. Thus, the gang-related evidence has a "tendency to make [Appellant's involvement] more ... probable than it would be without the evidence" and Appellant's involvement is clearly a fact "of consequence in determining the action." Pa.R.E. 401. . . .

We must now determine whether this gang-related evidence is barred by Pennsylvania Rule of Evidence 404(b). Rule 404(b) generally prohibits "[e]vidence of a crime, wrong, or other act"

- 12 -

when such evidence is offered to show "that on a particular occasion the person acted in accordance with the character" shown by that crime, wrong, or other act. Pa.R.E. 404(b)(1). There are, however, exceptions to this general rule and "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 404(b)(2). Courts have also recognized another exception—*res gestae*—to give essential background information to the crimes on trial. *See* **Commonwealth v. Reid**, 99 A.3d 427, 451 (Pa. 2014). However, even if evidence falls within one of the exceptions, the probative value of the evidence must outweigh its potential for unfair prejudice. Rule 404(b)(2). Unfair prejudice is defined as "a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Rule 403, cmt. When weighing probative value and unfair prejudice, we "may consider whether and how much such potential for unfair prejudice can be reduced by cautionary instructions." Rule 404, cmt.

All evidence against a defendant in a criminal case will be prejudicial. **Commonwealth v. Peer**, 684 A.2d 1077, 1083 (Pa. Super. 1996). Our determination in this context, however, must be whether evidence is unfairly prejudicial. **Id.**; **see also** Rule 404(b)(2). While the trial court must exclude relevant but unfairly prejudicial evidence, we are "not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts form part of the history and natural development of the events and offenses with which [a] defendant is charged." **Commonwealth v. Broaster**, 863 A.2d 588, 592 (Pa. Super. 2004) (quotation omitted). In order for it to be excluded, relevant evidence must be "so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." **Id.** (quotation omitted).

As we stated above, Appellant's movements and actions on the night of the drive-by shooting would make little, if no, sense absent the background information of gang affiliation, hierarchy, and protocol. The Pennsylvania Supreme Court has held that admission of gang affiliation is proper when the Commonwealth alleges conspiracy as such evidence is highly probative of the crime of conspiracy and goes to prove "motive, intent, plan, design, ill will or malice." Appellant was charged with conspiracy. Proof of conspiracy under subsection (a)(1) requires a showing that a person intends to promote or facilitate the commission of a

- 13 -

crime and "agrees with [another] person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime." 18 Pa. C.S. § 903(a)(1). Evidence of gang affiliation, hierarchy, and protocol shows that Appellant had the motive, intent, and plan to conspire with his fellow gang members to participate in the drive-by. Thus, the gang-related evidence is admissible against Appellant under Rule 404(b).

Finally, we do not believe that admission of highly probative gang-related evidence would be "so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." This [c]ourt issued a cautionary instruction to the jury regarding the evidence relating to Appellant's membership in the Black P-Stone gang and the gang's illegal activity. The jury was instructed that this evidence could only be used for the limited purpose of tending to show motive and *modus operandi*. We presume that the jury follows the [trial c]ourt's instruction. Any prejudice that may arise from admission of this gang-related evidence would be curable through a cautionary jury instruction and, thus, is not unfairly prejudicial. ***See*** Rule 404, cmt; ***see also Commonwealth v. Whitfield***, 419 A.2d 27, 29 (Pa. Super. 1980) (finding a jury can be instructed not to assume guilt simply because of gang affiliation).

Trial Ct. Op. at 7-9 (some citations omitted).

Based on our review of the record, we conclude that the trial court thoroughly addressed this issue. ***See id.*** Moreover, we discern no abuse of discretion by the trial court. ***See Kane***, 188 A.3d at 1229. We therefore adopt the trial court's analysis as our own.

<u>Shaye Sickles' Testimony</u>

Appellant also argues that it was error for the trial court to allow Shaye Sickles to testify regarding a purported confession by Appellant's co-defendant, Mitchell. Appellant's Brief at 29. Appellant asserts that Mitchell's statement was "inadmissible pursuant to [***Bruton v. U.S.***, 391 U.S. 123

- 14 -

(1968),] wherein the [United States] Supreme Court held that the admission of a non-testifying accomplice's custodial confessions violated the defendant's confrontation right." *Id.* Appellant further contends that Mitchell's statement was "inadmissible hearsay and [did] not qualify under the co-conspirator exception because an admission of culpability would by definition be incompatible with a statement in furtherance of the conspiracy." *Id.* at 29-30. He also argues that "the co-conspirator exception is identified in [*Crawford v. Washington*, 531 U.S. 36 (2004)] as not being a firmly rooted exception to the hearsay rule." *Id.* at 30. Appellant asserts that the trial court "therefore erred in admitting this damning testimony into evidence at trial." *Id.* at 30.

The Commonwealth responds that Mitchell's statements to Sickles were properly admitted under the co-conspirator exception to the hearsay rule. Commonwealth's Brief at 25. Specifically, the Commonwealth argues that (1) other witness testimony established that there was a conspiracy between Mitchell and Appellant; (2) Mitchell's statements were made in furtherance of the conspiracy, as he made them while "attempting to avoid apprehension and avoid any evidence of the drive-by shooting." *Id.* at 26-27. Further, the Commonwealth asserts that both *Bruton* and *Crawford* "dealt with testimonial statements" while Mitchell's statements were "undoubtedly non-testimonial[,] as they were made by [Mitchell] to [Sickles, who was] his girlfriend at the time." *Id.* at 26.

By way of background, at trial, the Commonwealth called Shaye Sickles to testify regarding statements that Mitchell made to her after the shooting. N.T. Trial, 1/23/19, at 226. Appellant objected, arguing that Mitchell's statements were inadmissible hearsay and that the Commonwealth was "offering statements of a co-conspirator against [Appellant] without . . . the opportunity [for Appellant] to cross-examine the co-conspirator." *Id.* at 228.

Over Appellant's objection, Sickles testified that, on the day after the shooting, Taylor called her cell phone while she was at school and instructed her to have Mitchell "call [Taylor, then] get his gun and bring it over to the [trap] house." *Id.* at 238-239. After Sickles relayed Taylor's message to Mitchell, Mitchell showed Sickles an online article about a drive-by shooting. When Sickles asked Mitchell "if he did it," he replied "Yeah, me and [Appellant]." *Id.* at 238.

Generally, hearsay evidence is not admissible. *See* Pa.R.E. 801(c); Pa.R.E. 802. To establish the co-conspirator exception to the hearsay rule, the Commonwealth must prove that "(1) a conspiracy existed between declarant and the person against whom the evidence is offered and (2) the statement sought to be admitted was made during the course of the conspiracy. In addition, there must be evidence other than the statement of the co-conspirator to prove that a conspiracy existed." *Commonwealth v. Feliciano*, 67 A.3d 19, 27 (Pa. Super. 2013) (*en banc*) (citation omitted).

"The Confrontation Clause in the Sixth Amendment to the United States Constitution provides that all criminal defendants enjoy the right to confront

and cross-examine adverse witnesses. Moreover, the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." **Commonwealth v. Rosser**, 135 A.3d 1077, 1087 (Pa. Super. 2016) (*en banc*) (citations, quotation marks, and footnote omitted).

> In the seminal case of **Bruton** . . . the United States Supreme Court held that Bruton's Sixth Amendment right to confront witnesses was violated by the introduction of statements by Bruton's non-testifying co-defendant, Evans, that implicated Bruton by name, despite a limiting instruction from the trial court that Evans' statement should be considered only against him. **Bruton**, 391 U.S. at 135-36. The Court held that, although the limiting instruction was given, the statements were of such a powerfully incriminating nature that it was unlikely that the jury would have followed the trial court's instruction. **Id.**

> \*     \*     \*

> In **Crawford**, the United States Supreme Court held that, when the prosecution seeks to introduce "testimonial" hearsay into evidence against a criminal defendant, the Confrontation Clause of the Sixth Amendment requires: (1) that the witness who made the statement is unavailable; and (2) that the defendant had a prior opportunity to cross-examine the unavailable witness. **Crawford**, 541 U.S. at 59.

> \*     \*     \*

> Both **Crawford** and **Bruton** define the contours of the Confrontation Clause of the Sixth Amendment, but they do so for different purposes. **Crawford** ensures the procedural guarantee of the Confrontation Clause by requiring that the reliability of testimonial hearsay presented against the defendant be assessed in a particular manner, *i.e.*, by testing in the crucible of cross-examination. **Crawford**, 541 U.S. at 61. **Bruton**, and its progeny[,] on the other hand, act to neutralize the incriminating effect on the defendant of properly admitted confessions from a non-testifying co-defendant presented against the co-defendant at a joint trial. This distinction is crucial, and it arises from the

core concern of **Bruton**, *i.e.*, a confession from a non-testifying co-defendant that directly incriminates the defendant in a joint trial is of such a powerfully incriminating nature that a jury instruction limiting the jury's consideration of the confession to the co-defendant would be insufficient to cure the prejudice to the defendant from the confession's admission at trial. **Bruton**, 391 U.S. at 135-36.

**Commonwealth v. Whitaker**, 878 A.2d 914, 919-22 (Pa. Super. 2005)

(some citations, emphases, and footnote omitted).

Here, the trial court addressed the applicability of the co-conspirator

hearsay exception as follows:

As to the first requirement, there was overwhelming evidence presented at trial to show that a conspiracy to commit murder existed between all the actors involved, including the declarant, Mitchell, and Appellant. There was testimony from several witnesses establishing that Appellant, Taylor, Murray and Mitchell, were all part of the Black P-Stone gang including testimony from Trooper Patton who conducted a thorough investigation into the gang. Furthermore, Appellant went with the group of fellow gang members to the house of Brandon Kravchenko to seek revenge for a bad drug deal. Appellant knew the group went to the house with a gun. The gang leader, Taylor, gave his permission via telephone for the group to do what they had to do. After receiving information that the house was occupied, Appellant, Murray and Mitchell instructed Bunnell to shut off her car lights and "slow down" as she approached the front of the Kravchenko residence. While Bunnell did so, Appellant fired shots from the open car window, towards the occupied residence. As a result of these shots being fired at the Kravchenko residence, [the decedent] sustained a bullet wound to the head which killed him. Further, after the murder, arrangements were made for Appellant to get out of the area and for Mitchell to get everything associated with the crime over to the gang's trap house and wait there.

As to the second requirement, Shaye Sickles was contacted by Sirvonn Taylor at school the morning after the murder of [the decedent] so that she could relay a message to or get him in contact with her boyfriend, Dygunn Mitchell. Taylor told Sickles that he had just left the police station and that Mitchell was to go

- 18 -

to his grandmother's house, get everything out of it and meet Taylor at the gang's trap house. When Sickles made contact with Mitchell at school, he showed her a newspaper article of the drive-by shooting and death of [the decedent]. Sickles asked Mitchell if he was the one who did it to which Mitchell responded "Yeah. Me and B'zah." Sickles related that "B'zah" was Appellant's nickname in school. Mitchell then told Sickles that he was leaving school, going to his grandmother's house and then over to the trap house on Second street. Sickles testified that what Taylor meant by get everything out of Mitchell's grandmother's house was for Mitchell to get the gun and bring it to the trap house which is what she told Mitchell. After school was over, Sickles stated that she and a friend went to Mitchell's grandmother's house but he was not there so they went to the trap house on Second Street and found Mitchell at the residence. These statements were in furtherance of the conspiracy because Sickles was given specific instructions from Taylor to relay to Mitchell regarding the crime and what to do with the evidence related to the crime.

Therefore, all requirements for this exception to the hearsay rule were met and Sickles' testimony regarding her interaction with Mitchell and his statements was admissible pursuant to Pa.R.E. 803(25)(E).

Trial Ct. Op. at 11-12 (citations omitted).

Based on our review of the record, we discern no abuse of discretion or error of law by the trial court. *See Kane*, 188 A.3d at 1229. The trial court properly analyzed the applicability of the hearsay exception for statements by a co-conspirator, and we therefore adopt the trial court's analysis on that issue as our own. *See* Trial Ct. Op. at 11-12.

In addressing Appellant's Sixth Amendment claim, the trial court relied on *Crawford*. *Id.* at 13. The trial court found that Mitchell's statements were non-testimonial, as they

were not made under circumstances that would lead an objective witness reasonably to believe that the statement would be

available for use at a later trial. Sickles began the conversation by relaying a message from one of Mitchell's co-conspirators who was trying to help Mitchell get rid of the evidence associated with the crime. Further, Mitchell showed Sickles the newspaper article about the shooting and stated that he and Appellant were responsible so Sickles understood the context of what Taylor told her over the phone. Sickles was also Mitchell's girlfriend at the time[,] which would make one believe Mitchell was even less likely to believe any statements made would be later used at trial. The testimony presented by Sickles from her conversation with Mitchell resembles a casual remark to an acquaintance more so than a formal statement to a government officer, which the **Crawford** court determined to be more consistent with nontestimonial.

Mitchell's statements and the conversation between Mitchell and Sickles were "nontestimonial," therefore; the Confrontation Clause does not bar their admission so long as the statements fall within a firmly rooted hearsay exception or contain particularized guarantees of trustworthiness. As discussed above, we find that Mitchell's statements were properly admitted under the co-conspirator exception to the hearsay rule pursuant to Pa.R.E. 803(25)(E). Accordingly, as the statements fall within a firmly rooted hearsay exception, we find that the Confrontation Clause does not bar their admission.

Thus, Appellant's assertion of error as to Shaye Sickles' testimony about a statement by alleged co-conspirator Dygunn Mitchell is without merit.

*Id.* at 13-14.

To the extent Appellant argues that Mitchell's statement violated his rights under the Confrontation Clause, we agree with the trial court that he is not entitled to relief. As noted previously, Appellant objected to Mitchell's statement on the basis that he did not have an opportunity to cross-examine Mitchell at trial. **See** N.T. Trial, 1/23/19, at 228. Given the relief requested by Appellant, the trial court properly applied **Crawford**, which "ensures the procedural guarantee of the Confrontation Clause by requiring that the

reliability of testimonial hearsay presented against the defendant be assessed . . . [through] cross examination." **Whitaker**, 878 A.2d at 922 (emphasis omitted). Further, the trial court properly addressed the non-testimonial nature of Mitchell's statement and properly found that **Crawford** did not bar its admission at trial. **See** Trial Ct. Op. at 13-14. We therefore adopt the trial court's analysis on that issue as our own. **Id.**

Finally, although Appellant references **Bruton**, he fails to explain how it applies in the instant case. **See Commonwealth v. Johnson**, 985 A.2d 915, 924 (Pa. 2009) (stating that "where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." (citations omitted)). Therefore, we could find Appellant's claim waived. Nonetheless, because Appellant was not tried jointly with Mitchell, we conclude that Appellant's passing reference to **Bruton** does not merit relief. **See Commonwealth v. McCrae**, 832 A.2d 1026, 1038 (Pa. 2003) (stating that **Bruton** requires redaction "only in the context that gave rise to the decision, *i.e.*, the introduction of a powerfully incriminating statement made by a non-testifying co-defendant at a joint trial." (citations omitted)). Accordingly, Appellant is not entitled to relief.

<u>Mitchell's Sawed-off Shotgun</u>

Appellant next argues that the trial court erred by "allowing the Commonwealth to introduce into evidence a sawed-off shotgun possessed by [Mitchell] at the time of his arrest." Appellant's Brief at 30. Appellant asserts

that "[t]here was no indication that this weapon was fired during the drive-by or had any connection to the shooting" and, therefore, it was inadmissible. *Id.* Further, he claims that admitting the gun "in a homicide trial where the Commonwealth has not produced the murder weapon can only be regarded as highly prejudicial. This is particularly true where, as here, the Commonwealth had other means to establish [Appellant's] membership in the Black P-Stones gang." *Id.* at 31.

The Commonwealth responds that the shotgun "was properly admitted as relevant evidence for the charge of conspiracy." Commonwealth's Brief at 28. Specifically, the Commonwealth contends that "Mitchell's attempt to dispose of the sawed-off shotgun prior to his apprehension was similar to his disposal of the murder weapon at the 'trap house' as instructed by [Taylor]. This was a continuation of the conspiracy and cover-up of the crime committed" and "also tended to corroborate the Commonwealth's [Rule 404(b)] evidence addressing the P-Stones and the availability of 'gang property,' particularly firearms." *Id.* at 30.

The trial court addressed Appellant's claim as follows:

[T]he sawed-off shotgun found on Dygunn Mitchell is relevant to show how the people who participated and knew about the criminal episode were associated, including the gang structure, and how they attempted to get rid of all potential evidence that could connect them or the gang to illicit activity. Therefore, this evidence also tends to show that Appellant's involvement was more probable than it would be without the evidence. Thus, evidence of Black P-Stone hierarchy and protocol, Appellant's affiliation with the gang, and the sawed-off shotgun found on Dygunn Mitchell's person is relevant.

Trial Ct. Op. at 7.

Based on our review, we conclude that the trial court thoroughly addressed this issue. *See id.* Moreover, we discern no abuse of discretion or error of law by the trial court. *See Kane*, 188 A.3d at 1229. We therefore adopt the trial court's analysis as our own.

In Appellant's next issue, he argues that the trial court erred by denying his request for a jury instruction on involuntary manslaughter. Appellant's Brief at 43. Appellant notes that he "was charged with criminal homicide, which includes involuntary manslaughter." *Id.* He asserts that "[t]he Commonwealth did not withdraw the involuntary [manslaughter] charge, [and it] was therefore an issue in the case." *Id.*

The Commonwealth responds that there was no evidence that could reasonably support a conviction for involuntary manslaughter. Commonwealth's Brief at 39. Further, the Commonwealth notes that Appellant "failed to put forth any reasonable suggestion in his brief or when he requested the instruction that an involuntary manslaughter instruction" was warranted. *Id. a*t 42. Therefore, the Commonwealth contends that the trial court properly denied Appellant's request. *Id.*

When reviewing a challenge to jury instructions, this Court will "reverse a [trial] court's decision only when it abused its discretion or committed an error of law." *Commonwealth v. Galvin*, 985 A.2d 783, 799 (Pa. Super. 2009) (citation omitted). When a trial court refuses to deliver a specific jury instruction, "it is the function of this Court to determine whether the record

supports the trial court's decision." **Commonwealth v. Buterbaugh**, 91 A.3d 1247, 1257 (Pa. Super. 2014) (*en banc*) (citation and quotation marks omitted). "[T]he relevant inquiry for this Court . . . is whether such charge was warranted by the evidence in the case." **Commonwealth v. Baker**, 963 A.2d 495, 506 (Pa. Super. 2008) (citation and quotation marks omitted).

Trial courts are not to instruct a jury on legal principles that are not applicable to the facts presented at trial because such instructions are likely to confuse jurors and place obstacles in the path of a just verdict. **See Commonwealth v. Taylor**, 876 A.2d 916, 925 (Pa. 2005). Therefore, a defendant must establish that the trial evidence would have reasonably supported a verdict based on the desired charge, and may not claim entitlement to an instruction that is not supported by the evidence presented at trial. **Id.** at 925-26.

Additionally, "[u]nder Pennsylvania law, a homicide defendant is entitled to a charge on involuntary or voluntary manslaughter only if the evidence adduced at trial would reasonably support a verdict on such a charge." **Commonwealth v. Soltis**, 687 A.2d 1139, 1141 (Pa. Super. 1996) (citations omitted). "In other words, a trial court can give a manslaughter instruction only when there is evidence tending to show that the defendant is not guilty of the crime of murder but is guilty of the lesser crime of manslaughter." **Id.** (citation omitted). "In determining whether the evidence would support a manslaughter charge, we must view the evidence in the light most favorable to the defendant." **Id.** (citation omitted).

- 24 -

Here, in its Rule 1925(a) opinion, the trial court addressed Appellant's claim as follows:

> The Pennsylvania Supreme Court has defined involuntary manslaughter as the killing of another without malice and unintentionally, in doing some unlawful act not amount to a felony or naturally tending to cause death or great bodily harm. [Here, t]he facts in evidence at trial did not reasonably support a finding of involuntary manslaughter. **See Commonwealth v. Rogers**, 615 A.2d 55, 61-62 (Pa. Super. 1992) (finding that an involuntary manslaughter charge was unwarranted where the evidence showed that the defendant had "fir[ed] the entire magazine of his weapon into an occupied vehicle," despite the defendant's statement that he shot above the car so that no one would be hit).
>
> Here, Appellant joined [his four co-defendants] voluntarily in order to confront the individual who sold the fake drugs to Bunnell. Appellant did so knowing that [his co-defendant,] Mitchell[,] was taking a gun to the scene. Moreover, there was ample testimony that, at the scene, Appellant purposefully fired that gun at a residence known to him to be occupied.[10] Thus, a charge on involuntary manslaughter was unwarranted as the facts developed at trial did not support such a charge.

Trial Ct. Op. at 20-21.

Based on our review of the record, we discern no error of law or abuse of discretion by the trial court. **See Galvin**, 985 A.2d at 799. As noted by the trial court, there was no evidence that could reasonably support a verdict for involuntary manslaughter. **See Soltis**, 687 A.2d at 1141. Therefore, the trial court properly declined Appellant's request for a jury instruction on that basis.

---

[10] Further, the trial court explained that the evidence at trial was "sufficient for the jury to have found beyond a reasonable doubt that Appellant committed a killing with malice aforethought." Trial Ct. Op. at 18.

In his next claim, Appellant argues the trial court erred by failing to instruct the jury that it could draw an adverse inference from the Commonwealth's failure to introduce certain items into evidence. Appellant's Brief at 44. Specifically, Appellant argues the following:

> [The trial court] erred in refusing [Appellant's] request for the "missing evidence" instruction concerning physical items seized from Terrance Tyson and the members of the Kravchenko family, and telephones seized from various residences. The Commonwealth did not test all this information, which could have yielded information about [Appellant's] involvement with the Black P-Stones.
>
> The jury was entitled to consider whether the Commonwealth had deliberately withheld this information in an attempt to conceal information from the jury. [The trial court's] failure to instruct the jury on this charge was therefore in error.

*Id.*

The Commonwealth responds that "Appellant puts forth no basis for a reasonable belief that there would be anything of relevance" on the phones that could have been used as evidence at trial. Commonwealth's Brief at 44.

Pennsylvania Suggested Standard Criminal Jury Instruction 3.21B provides that "the jury is allowed to draw a common-sense inference that [an] item would have been evidence unfavorable to that party" when "there is no satisfactory explanation for [that] party's failure to produce an item," and (1) "the item is available to that party and not to the other"; (2) "it appears the item contains or shows special information material to the issue;" and (3) "the item would not be merely cumulative evidence." Pa. SSJI (Crim) § 3.21B(2).

Here, the trial court addressed Appellant's claim as follows:

A missing evidence charge is not meant to be given when there is a generalized allegation that a party did not present some evidence that may bear on an issue in the case. Indeed, where evidence or a witness is available to both sides to present at trial, that one side does not present said evidence or witness does not render it "missing." Appellant's trial did not reveal any specific document, item, or witness that was only available to the Commonwealth and not to the defense. Thus, the missing evidence charge requested by Appellant was irrelevant to the issues presented at trial and inappropriate.

Trial Ct. Op. at 19-20.

Based on our review, discern no abuse of discretion or error of law by the trial court. *See Galvin*, 985 A.2d at 799. As noted by the trial court, Appellant failed to establish that there was any "missing evidence" that was only available to the Commonwealth. Therefore, the trial court properly denied Appellant's request.

Finally, we address Appellant's sentencing claim.[11] Appellant argues that the trial court abused its "discretion by imposing a sentence that guarantees that [Appellant] will be an old man by the time he gets out of prison." Appellant's Brief at 46. He also asserts that the trial court failed to consider Appellant's mitigating circumstances. *Id.* at 47. Further, he contends that the "sentence ignores [Appellant's] zero prior record score and

---

[11] Although Appellant challenged the trial court's award of time credit in his statement of questions, he does not address the issue in his brief. Therefore, he has abandoned the issue on appeal. Nonetheless, the trial court thoroughly addressed this issue in its Rule 1925(a) opinion. *See* Trial Ct. Op. at 22-23. Therefore, to the extent this issue relates to the legality of Appellant's sentence, we adopt the trial court's analysis as our own. *See Commonwealth v. Beck*, 848 A.2d 987, 989 (Pa. Super. 2004) (stating that a trial court's failure to award credit for time served implicates the legality of a sentence).

fails to account for the significantly reduced sentences of his co-defendants." *Id.* at 47. Finally, he claims that the trial court's "failure to consider Appellant's mitigating circumstances, in conjunction with [the trial court's] decision to impose consecutive sentences for each REAP conviction, raises a 'substantial question' for appellate review." *Id.* at 46.

The Commonwealth responds that the trial court's sentence "was well-reasoned and within the standard guidelines." Commonwealth's Brief at 44. Further, the Commonwealth contends that the trial court considered all of the evidence presented by both parties, and properly exercised its discretion in fashioning Appellant's sentence. *Id.* at 47-48.

"[C]hallenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right." ***Commonwealth v. Derry***, 150 A.3d 987, 991 (Pa. Super. 2016) (citation omitted). Before reaching the merits of such claims, we must determine:

> (1) whether the appeal is timely; (2) whether Appellant preserved his issues; (3) whether Appellant's brief includes a [Pa.R.A.P. 2119(f)] concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence; and (4) whether the concise statement raises a substantial question that the sentence is inappropriate under the sentencing code.

***Commonwealth v. Corley***, 31 A.3d 293, 296 (Pa. Super. 2011) (citations omitted).

"To preserve an attack on the discretionary aspects of sentence, an appellant must raise his issues at sentencing or in a post-sentence motion.

Issues not presented to the sentencing court are waived and cannot be raised for the first time on appeal." **Commonwealth v. Malovich**, 903 A.2d 1247, 1251 (Pa. Super. 2006) (citations omitted); **see also** Pa.R.A.P. 302(a) (stating that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal").

Here, Appellant waived his discretionary sentencing claim by failing to raise it at sentencing or in a post-sentence motion. **See Corley**, 31 A.3d at 296. Therefore, it is waived.[12]

Judgment of sentence affirmed.

Judgment Entered.

_Joseph D. Seletyn_
Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/11/20

---

[12] Even if Appellant had properly preserved his sentencing claim, we would conclude that it lacks merit for the reasons set forth in the trial court's opinion. **See** Trial Ct. Op. at 23-24.